UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
Northern Division

**UNITED STATES OF AMERICA, for the use and benefit of**
**CAROLINA MARINE STRUCTURES, INC.,**

   **Plaintiff,**

v.                      Civil Action No.: _____

**JOINT FORCES CONSTRUCTION, LLC,**

  Serve: Bradley O. Berry, Registered Agent
      13901 Warwick Blvd., Suite E
      Newport News, VA 23602

and

**WESTFIELD INSURANCE CO.,**

  Serve: CT Corporation System, Registered Agent
      4701 Cox Rd, Suite 285
      Glen Allen, VA 23060

   **Defendants.**

## COMPLAINT

Plaintiff, the United States of America, for the use and benefit of Carolina Marine Structures, Inc. ("CMS"), by counsel, for its Complaint against defendants Joint Forces Construction, LLC ("JFC") and Westfield Insurance Co. ("Westfield"), states as follows:

### Jurisdiction and Venue

1. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1352, as this is an action on a bond executed under the laws of the United States. This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1331, as the action relates to a federal project and arises under 40 U.S.C. §§ 3131, *et seq*. (the "Miller Act").

2. Venue is proper pursuant to 28 U.S.C. § 113(a) and 40 U.S.C. § 3133(b)(3)(B), as this is a district within which the subject contract was performed.

## Parties

3. CMS is a corporation organized and existing under the laws of North Carolina with its principal place of business in Chesapeake, Virginia. It is in the business of, among other things, marine construction in the southeastern United States.

4. Upon information and belief, JFC is a limited liability company organized and existing under the laws of Virginia with its principal place of business in Newport News, Virginia. JFC is subject to jurisdiction in this Court as a contractor on a federal contract in this district.

5. Upon information and belief, Westfield is a corporation organized and existing under the laws of Ohio with its principal place of business in Westfield Center, Ohio. Westfield is subject to jurisdiction in this Court as a surety on a federal contract in this district.

## Nature of the Action

6. This is a suit for payment on a federal dredging project. CMS seeks payment from JFC and Westfield, as JFC's surety, for amounts owing to CMS on the project.

## Background

*Contracts and Payment Bond*

7. JFC entered into a contract with the United States Coast Guard ("USCG") whereby JFC agreed to provide maintenance dredging services at the USCG Station Oregon Inlet located near the southern end of Bodie Island, North Carolina, approximately 1.5 miles north-northwest of Oregon Inlet and 11 miles across Pamlico Sound from mainland North Carolina (the "Project").

8. On December 10, 2021, CMS entered a subcontract with JFC (the "Subcontract"), whereby CMS agreed to provide labor, equipment, materials, and supplies necessary to perform

dredging work (the "Dredging Work") in a designated area for the Project (the "Pay Area") as specified in Exhibit A to the Subcontract. A copy of the Subcontract is attached as **Exhibit 1**.

9. In connection with the Project, JFC, as principal, and Westfield, as surety, furnished Payment Bond No. 170643X (the "Payment Bond") for the protection of CMS pursuant to the Miller Act. A copy of the Payment Bond is attached as **Exhibit 2**.

*Required Dredge Depth of -7 Feet MLW*

10. The Dredging Work involved dredging the Pay Area to a required depth of -7 feet mean low water ("MLW"). *See* Exhibit A ¶ 1.1 to **Exhibit 1**. The contract documents further permitted two feet of allowable, but not required, over-dredging to ensure a contractor could meet the required depth. Thus, on this project, the allowable over-dredge depth was -9 feet MLW.

11. Under the Subcontract, CMS was to be paid for material dredged to -7 feet MLW (called base material) and material dredged to the allowable over-dredge depth of -9 feet MLW (called over-dredge material), but not material deeper than -9 feet MLW.

12. The final amount paid to CMS by JFC was to be calculated based on actual work performed, measured by the difference between a before-dredge survey ("BD Survey") and an after-dredge survey ("AD Survey") of the Pay Area.

13. The estimated amount of base material to be removed from the Pay Area to a depth of -7 feet MLW was 1,200 cubic yards. The estimated amount of over-dredge material to be removed from the Pay Area between -7 feet and -9 feet MLW was 2,400 cubic yards. *See* **Exhibit 1** at Exhibit A ¶ Additional Terms.

14. Based on these quantity estimates, the estimated the value of the Subcontract, but not the final value based on actual performance, was $1,274,896.25. *See* **Exhibit 1**.

*CMS Performs the Dredging Work*

15. In mid-December 2021, CMS began mobilization to perform the Dredging Work.

16. On December 31, 2021, CMS submitted its Pay Application No. 1 to JFC, a copy of which is attached hereto as **Exhibit 3**.

17. On January 31, 2022, CMS submitted its Pay Application No. 2 to JFC, a copy of which is attached hereto as **Exhibit 4**.

18. By mid-February, CMS had dredged the Pay Area to the required depth of -7 feet MLW, subject to minor finishing work to remove isolated high spots.

19. Nevertheless, on or about February 15, 2022, JFC directed CMS to perform additional dredging to reach the over-dredge depth of -9 feet MLW.

20. On February 15, 2022, JFC and CMS entered into a modification of the Subcontract which, among other things, increased the estimated contract amount to $1,516,550.00 (the "Modification"). A copy of the Modification is attached hereto as **Exhibit 5**. The Modification did not change the contract requirement of -7 feet MLW, but allowed payment at a different rate for additional dredging between -7 and -9 feet MLW. *See* **Exhibit 5**.

21. By February 25, 2022, CMS finished Dredging Work under the Subcontract.

*CMS Seeks Payment for its Work*

22. The terms of the Subcontract did not specify the means and methods for either the BD Survey or AD Survey. *See* **Exhibit 1**.

23. The BD Survey of the Pay Area was performed on or about January 3, 2022 by the survey company Quible & Associates, P.C. ("Quible").

24. The AD Survey was to be conducted by CMS or its surveying subcontractor.

25. On or about March 1, 2022, at CMS's request, the survey company Align Surveying

& Design, P.C. ("Align") conducted an AD Survey of the Pay Area.

26. In conducting the AD Survey, Align encountered considerable erratic readings using sonar. As such, instead of sonar, Align employed an industry-recognized surveying technique called the "pole and plate" method. The pole and plate method involves manually surveying elevations by physically locating the bottom with a pole that has a circular plate on the end. The pole is leveled and keyed to a known elevation marker to ensure accurate readings, which are taken throughout the dredged area.

27. The USCG has accepted surveys employing the pole and plate method on other projects in the same geographic area as this Project. In fact, the USCG did so on Project P/N 14929315 located at Station Hatteras Inlet in Hatteras Inlet, North Carolina, just one month after this Project. *See* surveys for Project P/N 14929315 attached hereto as **Exhibit 6**. [1]

28. The AD Survey by Align showed that CMS removed a total of 4,277 cubic yards of dredged material from the Pay Area. CMS submitted the AD Survey to JFC.

29. On March 8, 2022, CMS alerted JFC that the estimated dredge volume in the Subcontract was significantly less than what was actually removed, due at least in part to an error in the original estimated volume calculations. Among other things, the original calculations did not include a 3:1 slope that was part of the Pay Area.

30. In response to CMS's observations, Quible, the company that performed the BD Survey, recalculated the estimated amount of material to be dredged using the 3:1 slope of the Pay Area, which resulted in a new estimated volume of 5,340 cubic yards.

31. On March 28, 2022, CMS submitted its Pay Application No. 3 to JFC, a copy of which is attached hereto as **Exhibit 7**.

---

[1] There is a typo regarding the body of water stated on the surveys in **Exhibit 6**. The surveys show Oregon Inlet rather than Hatteras Inlet.

32. On April 20, 2022, CMS submitted it Pay Application No. 4 to JFC, a copy of which is attached hereto as **Exhibit 8**.

*JFC Fails to Pay CMS*

33. Upon information and belief, JFC has been paid by the USCG for the Dredging Work performed by CMS. JFC has not, however, paid CMS, nor has Westfield.

34. Instead of paying CMS, some two months after dredging was complete, JFC conducted its own survey through a survey company called Haden Frye & Associates ("HF&A"). To conduct the survey, HF&A used a 200 kHz echo sounder.

35. Upon information and belief, the 200 kHz echo sounder, instead of locating the elevation of the actual bottom, in many cases located and recorded the elevation of fluid mud or suspended sediment.

36. Due to its high frequency, for post-dredge disturbed content in shallow water, 200 kHz sonar does not consistently penetrate fluid mud or suspended sediment, often resulting in inaccurate readings. The U.S. Army Corps of Engineers Manual for Hydrographic Surveying, EM1110-2-1003, documents this at ¶ 2-17(c): "In naturally soft bottom areas, or in dredged areas with unconsolidated materials, it may be difficult to detect or even define the 'true bottom.' A low-frequency transducer signal (*e.g.*, 10 – 50 kHz) can usually penetrate a soft bottom layer and can help identify the first hard bottom return. However, even if a dual frequency echo sounder is used, it can still be a somewhat subjective decision as to what constitutes the true bottom."

37. HF&A did not use a low frequency echo sounder or a pole and plate. In fact, analysis of data points in HF&A's 200 kHz survey shows the inaccuracies that the Corps Manual predicts, as the survey suggests dredging activity actually *added* sediment in some areas.

38. Notwithstanding these deficiencies, the HF&A survey still showed that, in nearly all areas, CMS met the contract requirement of -7 feet MLW.

39. After JFC failed to pay CMS, and several months after the AD Survey by Align, JFC requested of the USCG an opinion on which kind of AD Survey USCG expected to receive. USCG stated it expected to receive a 200 kHz survey, despite failing to specify means or methods in the contract documents or any time while CMS performed the work. This after-the-fact response to JFC cannot alter the Subcontract, which contained no such requirement.

40. Because even the HF&A survey showed CMS's compliance with the contract depth of -7 feet MLW, CMS requested JFC to identify, as required under the contract documents, any specific areas that JFC believed were non-compliant. JFC never did so.

41. CMS further offered to re-dredge any high spots to cure defects noted, if any. In fact, CMS made such an offer nine (9) times, culminating in a letter dated December 16, 2022 to JFC (the ninth time), wherein CMS stated: "To that end, we have we have offered to re-dredge any high spots at least 8 times, on April 26, July 20, August 8, September 12, October 4, October 5, October 10, and November 4, 2022, but for reasons we do not understand, JFC has not permitted us to do so." **Exhibit 9**.

42. CMS and its surety also asked repeatedly for JFC to produce documentation of its submittals to USCG, payments from USCG for work performed by CMS, and any rejection by USCG of any areas dredged by CMS. *See, e.g.*, **Exhibit 10**. JFC never complied.

*CMS Asserts a Claim against the Payment Bond*

43. Upon information and belief, USCG paid JFC at least $1,666,226.00 for work performed on this Project, including labor and materials furnished by CMS. *See* **Exhibit 11**.

44. As a result of JFC's failure to pay CMS, CMS asserted a claim against the Payment

Bond by letter dated October 4, 2022, a copy of which is attached hereto as **Exhibit 10**.

45. CMS is a proper claimant under the Payment Bond because CMS furnished labor and materials to the Project pursuant to a contract with JFC.

46. CMS fully performed the Dredging Work in accordance with the terms of the Subcontract and Modification.

47. CMS satisfied all prerequisites to asserting a claim under the Payment Bond.

48. CMS has given written notice of its claims to both JFC and Westfield.

49. Neither JFC nor Westfield has paid CMS the amount due to CMS on the Project.

## COUNT I:
## BREACH OF CONTRACT

50. The allegations in the preceding paragraphs are realleged and incorporated by reference as if fully set forth herein.

51. The Subcontract as amended by the Modification is a contract.

52. Pursuant to the Subcontract and Modification, JFC agreed to pay CMS for Dredging Work performed on the Project.

53. CMS fully performed all work as required by the Subcontract and Modification.

54. JFC is in breach of the Subcontract and Modification for failure to pay CMS the balance due under the Subcontract and Modification.

55. As a result of JFC's breach of contract, CMS has been damaged in the amount of at least $1,097,735.00, plus interest.

## COUNT II:
## QUANTUM MERUIT

56. The allegations in the preceding paragraphs are realleged and incorporated by reference as if fully set forth herein.

57. CMS provided a benefit to JFC by supplying labor and materials to the Project.

58. JFC knew of the benefit conferred upon it because JFC requested that CMS provide the labor and materials.

59. JFC accepted and retained the benefit conferred upon it by accepting compensation from the government.

60. The circumstances of this case are such that it would be inequitable for JFC to retain the benefit of the labor and materials supplied by CMS without compensating CMS.

61. The reasonable value of the labor and materials supplied by CMS is at least $1,097,735.00, plus interest.

## COUNT III:
## PAYMENT BOND CLAIM

62. The allegations in the preceding paragraphs are realleged and incorporated by reference as if fully set forth herein.

63. On October 4, 2022, while not required to do so, CMS submitted a written claim against the Payment Bond to Westfield demanding payment for the amounts due to CMS on the Project under the Payment Bond and the Miller Act. *See* **Exhibit 9**.

64. CMS furnished labor or material in carrying out work provided for in a contract for which a payment bond was furnished under 40 U.S.C. § 3l33(b).

65. JFC benefited from the work performed by CMS.

66. More than 90 days but less than one (1) year has expired since CMS last performed work on the Project, and CMS has complied with all requirements for perfecting a right of action under the Payment Bond and the Miller Act.

67. Westfield breached the Payment Bond in violation of the Miller Act by failing to pay CMS for amounts owing from JFC.

68. The amount owing to CMS from Westfield as a result of its breach of the Payment Bond is at least $1,097,735.00, plus interest.

## **Prayer for Relief**

WHEREFORE, Carolina Marine Structures, Inc., by counsel, demands judgment against Joint Forces Construction, LLC and Westfield Insurance Company, jointly and severally, in the principal amount of at least $1,097,735.00, plus all costs, attorneys' fees, pre-judgment and post-judgment interest, including for violation of the federal Prompt Payment Act, and all other just and necessary relief.

Dated: February 24, 2023

**CAROLINA MARINE STRUCTURES, INC.**

*/s/ James L. Chapman, IV*
James L. Chapman, IV, NC State Bar No. 25122
CRENSHAW, WARE & MARTIN, P.L.C.
150 W. Main Street, Suite 1923
Norfolk, VA 23510
Telephone: (757) 623-3000
Facsimile: (757) 623-5735
jchapman@cwm-law.com
*Local Civil Rule 83.1(d) Counsel for Carolina Marine Structures, Inc.*

W. Ryan Snow, VA State Bar No. 47423
K. Barret Luxhoj, VA State Bar No. 86302
(*pro hac vice admission to be sought*)
CRENSHAW, WARE & MARTIN, P.L.C.
150 W. Main Street, Suite 1923
Norfolk, VA 23510
Telephone: (757) 623-3000
Facsimile: (757) 623-5735
wrsnow@cwm-law.com
kbluxhoj@cwm-law.com
*Counsel for Carolina Marine Structures, Inc.*