# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NORTH CAROLINA
# Northern Division

**UNITED STATES OF AMERICA, for the use and benefit of**
**CAROLINA MARINE STRUCTURES, INC.,**

    **Plaintiff and Counterclaim Defendant,**

v.                                            **Civil Action No.: 2:23-cv-14-BO-BM**

**JOINT FORCES CONSTRUCTION, LLC,** *et al.*,

    **Defendants, Counterclaim and Third-Party Plaintiffs,**

v.

**HARCO NATIONAL INSURANCE COMPANY,**

    **Serve: Harco National Insurance Company**
          **c/o Officer or Director**
          **702 Oberlin Road**
          **Raleigh, North Carolina, 27605**

    **Third-Party Defendant.**

_____

## DEFENDANTS' ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIM, AND THIRD-PARTY COMPLAINT

NOW COME Defendants Joint Forces Construction, LLC ("JFC") and Westfield Insurance Co. ("Westfield") (collectively "Defendants"), by counsel, and for their Answer, Affirmative Defenses, Counterclaim, and Third-Party Complaint in this matter, state as follows:

## ANSWER

1. The allegations of Paragraph 1 of the Complaint are legal conclusions to which response is not required; however, to the extent response is required Defendants admit the Complaint alleges entitlement under the Federal Miller Act, regarding which this Court has jurisdiction.

2. The allegations of Paragraph 2 of the Complaint are legal conclusions to which response is not required; however, to the extent response is required Defendants admit the subject construction project was performed within the Eastern District of North Carolina.

3. Upon information and belief, Defendants admit the allegations contained in Paragraph 3 of the Complaint respecting CMS incorporation and principal place of business and that CMS's business as relates to this action includes dredging.

4. Defendants admit that JFC is a limited liability company organized and existing under the laws of Virginia and that the subject construction project was performed with the Eastern District of North Carolina. Defendants deny JFC's principal place of business is in Newport News, Virginia.

5. Upon information and belief, Defendants admit the allegations contained in Paragraph 5 of the Complaint.

6. Defendants admit that this suit is CMS seeking payment from Defendants on a federal dredging project but denies owing CMS any amount and denies all remaining allegations contained in Paragraph 6 of the Complaint.

7. Defendants admit JFC entered into a contract ("Contract") with the United States Coast Guard ("USCG" or "Government"), designated by the USCG as Task Order 70Z08322FABCD0001 and entitled "Maintenance Dredging USCG Station Oregon Inlet Nags Head, NC" ("Project"), the terms for which speak for themselves.

8. Defendants admit that JFC subcontracted portions of the Contract's work to CMS as set forth in the parties' written subcontract agreement dated December 10, 2021, as modified by Modification #1 dated February 15, 2022 (collectively "Subcontract"), the terms for which speak for themselves, portion of which is included as Exhibit 1 to the Complaint.

9. Defendants admit that JFC, as principal, and Westfield, as surety, posted a payment

bond, designated as Bond No. 170643X ("Payment Bond"), copy of which is included as Exhibit 2 the terms for which speak for themselves.

10. Defendants deny the allegations contained in Paragraph 10 of the Complaint as stated. The Contract speaks for itself.

11. Paragraph 11 of the Complaint alleges legal conclusions to which response is not required in that the Subcontract speaks for itself. To the extent, however, response is required, Defendants deny those allegations as stated as being inaccurate and incomplete statement of CMS's obligations under the Subcontract.

12. Admitted that unit prices were subject to calculation based upon actual work performed at the agreed unit pricing, including USCG accepted before and after dredging survey soundings and otherwise per pre-conditions for payment per the Subcontract and Contract documents, the terms for which speak for themselves.

13. Paragraph 13 of the Complaint alleges legal conclusions to which response is not required in that the Subcontract (Exhibit 1 to Complaint) speaks for itself.

14. Defendants deny the allegations contained in Paragraph 14 of the Complaint as stated.

15. Admitted.

16. Admitted.

17. Denied.

18. Denied.

19. Defendants deny the allegations contained in Paragraph 19 of the Complaint as stated.

20. Defendants admit JFC entered into a modification of the Subcontract as stated earlier in this Answer, but deny any characterization thereof and thereby denies the remaining allegations of Paragraph 20. The Subcontract, including Modification No. 1, speaks for itself.

21. Denied.

22. Denied.

23. Defendants admit that a purported, revised, Before Dredge Survey document was prepared by Quible & Associates, P.C. ("Quible") on or about January 3, 2022, described therein by Quible as a "Water Depth Exhibit," that, *inter alia*, was not guaranteed by Quible and that was, upon information and belief, prepared based upon purported survey data and other foundational information not actual prepared or verified by Quible and regarding which Quible express disclaimed responsibility for error or omission.

24. Denied.

25. Upon information and belief, the allegations of Paragraph 25 are denied, including because Align having done so is contrary to the project's daily reports and Defendants understand that Align personnel did not conduct such survey.

26. Upon information and belief, the allegations of Paragraph 26 are similarly denied as they relate to alleged AD Survey by Align.

27. Defendants are without sufficient information to admit or deny the allegations contained in Paragraph 27 of the Complaint and further note that the USCG expressly rejected use of such pole and plate methodology for this Project.

28. Denied.

29. Defendants deny the allegations contained in Paragraph 29 of the Complaint as stated, but admit that CMS informed JFC that CMS's earlier BD Survey was inaccurate and CMS intended to submit a revised BD Survey.

30. Defendants deny the allegations contained in Paragraph 30 of the Complaint as stated.

31. Denied.

32. Denied.

33. Denied.

34. Admitted to the extent it claims that JFC conducted its own after-dredge survey through HF&A, but JFC denies any contention or allegation that CMS completed all conditions precedent to payment and denies any remaining allegations in Paragraph 34.

35. Denied.

36. Denied.

37. Denied.

38. The HF&A survey speaks for itself. Defendants deny that CMS met the requirements of the Subcontract and otherwise denies the allegations of Paragraph 38 of the Complaint.

39. Defendants deny that CMS met the requirements of the Subcontract and otherwise denies the allegations of Paragraph 39 of the Complaint.

40. The HF&A survey speaks for itself. Defendants deny that CMS met the requirements of the Subcontract and otherwise deny the allegations of Paragraph 40 of the Complaint.

41. Denied.

42. Denied.

43. Denied.

44. Defendants admit that a claim was asserted by CMS in conjunction with the letter included as Exhibit 10, but deny such claim was properly made by CMS.

45. The allegations contained in Paragraph 45 of the Complaint contain legal conclusions to which no response is required.

46. Denied.

47. Denied.

48. Admitted to the extent Paragraph 48 claims that CMS purported to give JFC and Westfield notice of its claims, but denied as to the accuracy of the purported claims.

49. Denied.

50. The allegations contained in Paragraph 50 of the Complaint are re-allegations of Paragraphs 1 through 49, to which Defendants re-allege and incorporate its answers above and other defenses herein.

51. The allegations contained in Paragraph 51 of the Complaint contain legal conclusions to which no response is required.

52. The allegations contained in Paragraph 52 of the Complaint contain legal conclusions to which no response is required.

53. Denied.

54. The allegations contained in Paragraph 54 of the Complaint contain legal conclusions to which no response is required.

55. Denied.

56. The allegations contained in Paragraph 56 of the Complaint are re-allegations of Paragraphs 1 through 55, to which Defendants re-allege and incorporate its answers above and other defenses herein.

57. The allegations contained in Paragraph 57 of the Complaint contain legal conclusions to which no response is required.

58. The allegations contained in Paragraph 58 of the Complaint contain legal conclusions to which no response is required.

59. The allegations contained in Paragraph 59 of the Complaint contain legal conclusions to which no response is required.

60. The allegations contained in Paragraph 60 of the Complaint contain legal conclusions to which no response is required.

61. Denied.

62. The allegations contained in Paragraph 62 of the Complaint are re-allegations of

Paragraphs 1 through 61, to which Defendants re-allege and incorporate its answers above and other defenses herein.

63. Defendants admit that CMS sent a letter on October 4, 2022, to Westfield, but denies any characterization thereof and any remaining allegations contained in Paragraph 63.

64. Paragraph 64 contains legal conclusions for which no response is required. To the extent that a response is required, Paragraph 64 is denied.

65. The allegations contained in Paragraph 65 of the Complaint contain legal conclusions to which no response is required. To the extent that a response is required, Paragraph 65 is denied.

66. The allegations contained in Paragraph 66 of the Complaint contain legal conclusions to which no response is required. To the extent that a response is required, Paragraph 66 is denied.

67. The allegations contained in Paragraph 67 of the Complaint contain legal conclusions to which no response is required. To the extent that a response is required, Paragraph 67 is denied.

68. Denied.

The "WHEREFORE" Paragraph is CMS's prayer for relief to which a response is not required; however, to the extent an answer is required, Defendants deny CMS is entitled to the requested relief.

## AFFIRMATIVE DEFENSES

A.  Defendants deny all allegations of the complaint not expressly admitted and demand strict proof thereof.

B.  Defendants deny liability as alleged by CMS, or in any other way, amount, or manner.

C.  Defendants deny CMS is entitled to recovery or relief as alleged or otherwise; either factually or legally.

D.  Westfield, as surety, relies upon all defenses available to its principal, JFC.

7

E. CMS defaulted regarding its obligations under the Subcontract, including ultimately failing and refusing to perform the Subcontract work, and despite notice still failed and refused to perform, and was accordingly properly terminated for default; which circumstances bar, preclude, and estop CMS's claims and/or the granting of relief as sought by CMS.

F. CMS materially breached its subcontract obligations and was the first to breach, which breaches bar and preclude CMS's claims.

G. CMS's claims are barred by the doctrine of unclean hands.

H. CMS's claims are barred by the failure of conditions precedent.

I. CMS's breaches of its obligations damaged JFC, for which CMS is liable to JFC, and which amounts further preclude, bar, estop, and offset CMS's claim under or respecting any recovery of or relief to CMS in this action.

J. Defendants rely upon and incorporate the allegations of Defendants' counterclaim against CMS.

K. Defendants reserve the right to amend their affirmative defenses to add additional affirmative defenses which may be adduced through further discovery, further investigations, or trial.

WHEREFORE, Joint Forces Construction, LLC and Westfield Insurance Co., by counsel, demand dismissal of this action with prejudice, pray that judgment be entered against CMS and in favor of Defendants, that CMS be ordered to pay Defendants' attorney, expert and/or litigation fees, in addition to actual costs and damages incurred by Defendants as due to Defendants by CMS per the Subcontract, and that Defendants be awarded such other and further relief as deemed proper by the court.

**COUNTERCLAIM AND THIRD-PARTY COMPLAINT**

Defendant and Third-Party Plaintiff JFC asserts the following counterclaim against

8

Plaintiff CMS and Third-Party Complaint against Third-Party Defendant Harco National Insurance Company ("Harco"):

## PARTIES

1. Defendant and Third-Party Plaintiff JFC is a limited liability company organized and existing under the laws of Virginia with its principal place of business in Newport News, Virginia.

2. Plaintiff and Counterclaim Defendant CMS is a corporation organized and existing under the laws of North Carolina with its principal place of business in Chesapeake, Virginia.

3. Third-Party Defendant Harco is a corporation organized and existing under the laws of Illinois with its principal place of business in North Carolina located at 702 Oberlin Road, Raleigh, North Carolina 27605.

## JURISDICTION

4. This court has jurisdiction over this action pursuant to 28 U.S.C. § 1352 and 28 U.S.C. § 1367.

5. Venue is proper in this Court pursuant to 28 U.S.C. § 113(a) as this is the district within which the subject contract was performed.

## FACTS

6. On December 20, 2021, CMS entered into a subcontract with JFC (the "Subcontract") in which CMS agreed to furnish labor and materials for a portion of a certain dredging project called "Oregon Inlet Maintenance Dredging Contract" being performed by JFC for the United States Coast Guard (the "Project").

7. The Subcontract included the base amount of $1,274,896.25 for dredging by CMS to -7 at $1,100,000.00 and for over dredging by CMS to -9 at $65.00 per cubic yard plus bond expense.

8. CMS was contractually required to dump all dredging spoils to a specified location owned by Dare County, NC.

9

Case 2:23-cv-00014-BO-BM   Document 8   Filed 07/10/23   Page 9 of 17

9. To further corroborate the depths and dredging quantities achieved, CMS was contractually obligated to have a "Coast Guard approved registered surveyor" conduct before-dredge and an after-dredge survey.

10. The before-dredge survey was conducted by Quible & Associates, P.C. (the "Quible survey").

11. The Quible survey was a 200kHz survey.

12. CMS began mobilizing to the project site on January 3, 2022.

13. On January 5, 2022, CMS requested a change order for differing conditions after the Quible survey showed additional amounts to be dredged that were over the USCG's initial estimate to be dredge for base depths despite the contract addressing this possibility in Unit Work Item 1 of the bid.

14. On February 11, 2022, CMS indicated it would not continue dredging to -9 without an unjustified contract modification.

15. On February 13, 2022, CMS submitted a letter to JFC indicating project completion and giving JFC 24 hours to respond with an unjustified contract modification to continue dredging.

16. On February 15, 2022, CMS and JFC entered into a Subcontractor Modification, which contractually obligated CMS to dredge to depth of -9 (the "Change Order"). **Exhibit A**.

17. On March 28, 2022, CMS submitted a pay application for period to 3/31/22 for 100% of base work without an after-dredge survey to confirm work completed. JFC notified CMS that the USCG would not accept its pay application without the required after-dredge survey.

18. Despite repeated demand by JFC between February 2022 and March 2022, CMS failed to provide JFC with a copy of its after-dredge survey.

19. On March 30, 2022, JFC submitted a Notice to Cure to CMS giving them 48 hours to provide the after-dredge survey per the Subcontract.

20. On March 31, 2022, CMS responded to JFC's Notice to Cure by again insisting on a change order to supply the after-dredge survey.

21. Instead of having a Coast Guard approved registered surveyor conduct the after-dredge survey, CMS purportedly relied on a "pole and plate method" to measure the after-dredge depths and submitted its purported data as its claimed after-dredge survey.

22. Instead of using a Coast Guard approved registered surveyor, CMS purportedly collected data itself and then provided it to a surveyor for plotting.

23. This "pole and plate" methodology is not the same methodology as used in the before-dredge 200khz survey.

24. The 200 khz survey methodology was not only industry standard, but Coast Guard approved.

25. JFC notified CMS that its desired method for the after-dredge survey was unacceptable, that its purported after-dredge survey was unacceptable, and it was in default.

26. Despite demand for a survey that complies with the Subcontract's terms, CMS refused to produce an after-dredge survey conducted by a Coast Guard approved registered surveyor.

27. Even CMS's own after-dredge survey showed that it had not dredged to the required depths in multiple areas.

28. JFC made multiple demands for CMS to finish the contracted work and CMS refused.

29. CMS's failure to meet the contract requirements was verified further by the documentation of CMS's dredge disposal quantities.

30. By contract, there was only one authorized depository, that being the disposal site operated by Dare County, North Carolina.

31. JFC obtained the dump tickets from Dare County to try and corroborate the amounts dredged as claimed by CMS. The dump tickets do not corroborate the amount dredged as claimed

by CMS and instead show a substantially lower amount of dredging spoils was dumped at the authorized location.

32. The County's dump tickets confirmed the quantities of spoils deposited by CMS were significantly less than the quantities CMS was claiming to have dredged using its pole and plate survey approach—separately confirming that CMS had not met the contract requirements for dredging.

33. Despite JFC's repeated attempts to get the survey and disposal information from CMS, which they were contractually obligated to supply, CMS steadfastly refused to provide that information to JFC.

34. Because of CMS's failure to comply with the contract terms and produce a compliant after-dredge survey, and further the foregoing concerns regarding CMS's dredge quantities, JFC hired Hayden Frye and Associates, Inc. ("Hayden Frye"), a Coast Guard approved registered surveyor, to conduct an after-dredge survey.

35. Hayden Frye conducted a 200kHz survey of the project.

36. On April 12, 2022, Hayden Frye submitted their survey indicating that the Subcontract requirements were not met, and quantities dredged did not correspond with what CMS was claiming in its pay applications (the "Hayden Frye survey").

37. The Hayden Frye survey confirmed that CMS did not satisfy the Subcontract.

38. JFC shared the Hayden Frye survey with CMS and demanded that CMS complete the work under the Subcontract.

39. Despite repeated demand, CMS continued to fail to complete the work under the Subcontract and refused to accept the depths as recorded by the Hayden Frye Survey.

40. At CMS's request, by Request for Information dated November 14, 2022, JFC requested additional information from the Coast Guard as to the appropriate method for the after-

12

dredge survey. **Exhibit B**.

41. The USCG responded to JFC's RFI and rejected the "pole and plate" method employed by CMS and stated, among other things, that the after-dredge survey must be a 200kHz survey. **Exhibit C**.

42. JFC notified CMS of the USCG's response to JFC's RFI regarding the appropriate method for the survey and demanded a new survey be completed and that CMS complete its work under the Subcontract.

43. CMS continued to refuse JFC's demands to complete the work and produce a compliant after-dredge survey.

44. CMS thwarted all efforts by JFC to have CMS correct and complete the subcontract work.

45. CMS failed to cure its defaults in performance of the Subcontract. Therefore, by letter dated December 9, 2022, JFC terminated the Subcontract for Default.

46. Because of CMS's failure to complete the Subcontract, JFC had to hire a replacement contractor, Lake Services, to finish the dredging work under the Subcontract.

47. JFC incurred costs and expenses to hire the replacement contractor and to correct / complete CMS's subcontract work.

## COUNTERCLAIM

Count 1 – Breach of Contract (Against CMS)

48. JFC incorporates and re-allege the allegations contained in Paragraphs 1 through 47 as if fully stated herein.

49. All conditions precedent, if any, to CMS's liability and recovery by JFC, as alleged and as sought herein have occurred, been met, been satisfied, or been waived.

50. CMS failed to complete a post-dredge survey that complied with the Subcontract as it

was, among other things, not completed by a U.S. Coast Guard registered surveyor and was not conducted in a methodology approved by the Coast Guard.

51. Further, CMS did not dredge the quantities they claimed nor did they satisfy the terms of the Change Order, which required CMS to dredge to the depths of -9.

52. Even by CMS's own purported survey, CMS did not dredge the quantities they claimed nor did they satisfy the terms and obligations of the Subcontract, including the Change Order, namely dredging to the depths of -9. In some places, depths of -7 were not even accomplished.

53. JFC notified CMS multiple times of its breach and insisted that CMS complete the contracted work.

54. Despite repeated demand, CMS failed to comply with the Subcontract and complete the specified work as required under the Subcontract.

55. CMS failed to complete its work by the completion date.

56. CMS caused critical delays to the Project.

57. As a result of CMS's breach and failure to complete and properly perform work on the project, JFC was forced to hire its own labor and incur additional labor and equipment costs.

58. JFC has incurred additional costs, expenses and damages, and shall continue to incur additional costs and damages as a result of CMS's default on the Subcontract in an amount not less than $717,633.15 for which CMS is legally liable to JFC.

59. As a direct, proximate and foreseeable result of CMS's breach of the Subcontract and Change Order, JFC incurred additional costs and expenses necessary to complete the project.

WHEREFORE, Joint Forces Construction, LLC, by counsel, pray that judgment be entered against CMS and in favor of JFC for the amount of at least $717,633.15, that CMS be ordered to pay its attorney, expert and/or litigation fees, in addition to actual costs and damages incurred by JFC as due to JFC by CMS per the Subcontract, and that JFC be awarded such other and further

relief as deemed proper by the court.

## THIRD-PARTY COMPLAINT
## COUNT 1 – CLAIM ON PERFORMANCE BOND (against Harco)

60. JFC incorporates and re-alleges the allegations contained in Paragraphs 1 through 59 above as if fully stated herein.

61. All conditions precedent, if any, to Harco's liability and recovery by JFC, as alleged and as sought herein have occurred, been met, been satisfied, or been waived.

62. Harco provided the Performance Bond for the Project, which obligated Harco to ensure that its principal, CMS, performed under the Subcontract.

63. CMS's Performance Bond with Harco is a valid and binding bond that is enforceable under the laws of North Carolina.

64. CMS owed duties to JFC pursuant to the Subcontract to provide timely, proper, and complete work in accordance with the Subcontract.

65. As set forth herein, CMS failed to adequately perform under the Subcontract, causing critical delays on the Project and forcing JFC to hire a new contractor to complete CMS's work.

66. CMS failed and defaulted in its obligations under the Subcontract including, but not limited to, its dredging obligations and obligations to provide a compliant after-dredge survey.

67. CMS failed to furnish labor or materials in carrying out work provided for in the Subcontract for which a performance bond was issued.

68. Harco and CMS were notified of CMS's default.

69. JFC incurred costs and expenses to complete the work that CMS was contractually obligated to perform under the Subcontract.

70. As alleged herein and in the Counterclaim included herewith, JFC is entitled to damages in the amount of at least $717,633.15 for CMS's breach of the Subcontract.

71. Pursuant to the Performance Bond, Harco is obligated to pay JFC for any damages arising out of CMS's breach of its performance and obligations under the Subcontract.

72. To date, JFC has not received any payment from Harco in connection with CMS's breach of the Subcontract.

73. Harco breached the Performance Bond by failing to pay JFC for amounts owed by CMS.

74. The amount owing to JFC from Harco as a result of its breach of the Performance Bond is at least $717,633.15 plus interest.

WHEREFORE, Joint Forces Construction, LLC and Westfield Insurance Co., by counsel, demand dismissal of this action with prejudice, pray that judgment be entered against CMS and in favor of Defendants, that judgment be entered against Harco and in favor of JFC in the amount of at least $717,633.15, that CMS and/or Harco be ordered to pay Defendants' attorney, expert and/or litigation fees, in addition to actual costs and damages incurred by JFC as due to JFC by CMS per the Subcontract and due to JFC by Harco under the Performance Bond, and that JFC be awarded such other and further relief as deemed proper by the court.

This date: 7/10/2023

**JOINT FORCES CONSTRUCTION, LLC**
**WESTFIELD INSURANCE CO.**

/s/ Neil S. Lowenstein
Neil S. Lowenstein, N.C. State Bar No.: 26998
WOODS ROGERS VANDEVENTER BLACK PLC
8 Juniper Trail
Kitty Hawk, NC 27949
P: 252.261.5055 / F: 757.446.8670
E-mail: Neil.Lowenstein@wrvblaw.com
*Attorneys for Joint Forces Construction, LLC and Westfield Insurance Co.*

## CERTIFICATE OF SERVICE

I hereby certify that on July 10, 2023, a copy of Answer, Affirmative Defenses, Counterclaim, and Third-Party Complaint was served upon all counsel of record by electronic mail.

/s/ Neil S. Lowenstein
Neil S. Lowenstein, N.C. State Bar No.: 26998
WOODS ROGERS VANDEVENTER BLACK PLC
8 Juniper Trail
Kitty Hawk, NC 27949
P: 252.261.5055 / F: 757.446.8670
E-mail: Neil.Lowenstein@wrvblaw.com
*Attorneys for Joint Forces Construction, LLC and Westfield Insurance Co.*